JL:PEN/AFMLS
F.# 2010R02302

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

   - against -

ROBERT PETROSYANTS,

               Defendant.

- - - - - - - - - - - - - - -X

**S U P E R S E D I N G**
**I N F O R M A T I O N**

Cr. No. <u>11-591(S-3)(FB)</u>
(T. 18, U.S.C. §§ 371
and 3551 <u>et seq</u>.; T. 21,
U.S.C., § 853(p); and
T. 31, U.S.C., § 5317(c))

THE UNITED STATES ATTORNEY CHARGES:

<u>INTRODUCTION</u>

     At all times relevant to this Superseding Information, unless otherwise indicated:

I.   <u>Background</u>

   A.   <u>The Bank Secrecy Act</u>

     1.   The Bank Secrecy Act ("BSA"), codified at Title 31, United States Code, Sections 5313-5326, was a set of laws and regulations enacted by Congress to address an increase in money laundering through financial institutions.

     2.   Check cashers qualified as financial institutions within the meaning of the BSA. A check casher was someone engaged in the business of cashing checks for other people in amounts greater than $1,000 in currency or other monetary instruments, for any person, on any day, in one or more transactions. A check casher would

typically charge a fee for this service. Check cashers enabled people to cash checks without conducting transactions through a bank.

3. One of the BSA mechanisms to uncover criminal activity conducted through financial institutions was a requirement that check cashers and other financial institutions file with the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the Department of the Treasury, a FinCEN Form 104, which is entitled a "Currency Transaction Report" ("CTR"), for any transaction involving more than $10,000 in currency.

4. Title 31, United States Code, Section 5313(a) and related regulations, including Title 31, Code of Federal Regulations ("C.F.R."), Section 1010.313(a)-(b), effective Mar. 1, 2011, formerly Title 31, C.F.R., Section 103.22(c), required financial institutions, including check cashers, to treat multiple currency transactions as a single transaction and to file a CTR if the financial institution had knowledge that the multiple transactions were by or on behalf of any one person and resulted in cash in or cash out totaling more than $10,000 during any one business day.

5. Each CTR consisted of three parts. Part I required the financial institution to verify and accurately record the name and address of the individual who conducted a reportable currency transaction, as well as to accurately record the identity, social

2

security number, or taxpayer identification number of any person or entity on whose behalf the currency transaction was conducted. Part II required the financial institution to record the date, the amount of the transaction and the form of the transaction. Part III required identifying the name of the financial institution where the transaction occurred, the person completing the CTR and the person approving the completion and filing of the CTR.

B.    No-Fault Insurance

6.    Under New York State's "no-fault" insurance law, an insurance company that insured a vehicle involved in an accident was required to provide reimbursement of up to $50,000 per vehicle occupant for the occupant's "basic economic loss." Basic economic loss included expenditures for a number of different types of accident-related medical treatments and services, provided that these treatments and services were necessary and were actually provided. Because reimbursement payments were made without regard to the fault of the driver, insurance plans under this law were commonly referred to as "no-fault" coverage.

7.    Under New York State law, a vehicle occupant could assign his or her right to reimbursement from an insurance company to others, including, but not limited to, medical facilities that performed treatment and medical supply companies that provided medical equipment for their injuries. If such an assignment were

3

made, the medical facility or medical supply company, or its agent, would bill the insurance company directly for services rendered or for equipment that was provided and receive payment directly from the insurance company. Under certain circumstances, the medical facility or medical supply company would be entitled to bill the insurance company for an amount up to 150 percent of the costs incurred for the services rendered or the equipment provided.

8. No-fault insurance plans provided by private insurance companies under New York State law are health care benefit programs within the meaning of Title 18, United States Code, Sections 1347 and 1349.

9. "No-fault patients," who were victims or purported victims of motor vehicle accidents, assigned their claims for no-fault reimbursement to their health care providers, which included, among others, medical doctors, chiropractors, psychologists, psychiatrists, physical therapists and acupuncturists. The no-fault patients also assigned their claims for no-fault reimbursement to medical equipment suppliers who provided them with durable medical equipment ("DME"), which included, among other items, crutches, neck braces, whirlpools, infrared heating lamps and foam mattresses.

4

C.  The "J-1 Visa Holders," "Legal
    Permanent Residents" and "Shell Companies"

10.  A "J-1 visa" was a short-term, non-immigrant visa issued by the United States government to foreign nationals participating in cultural exchange programs.  The "J-1 visa holders" were individuals, whose identities are known to the United States Attorney, who were required to leave the United States after the expiration of their visas.

11.  The "legal permanent residents" were individuals, whose identities are known to the United States Attorney, who were permanent United States residents without United States citizenship.

12.  The "Shell Companies" were corporations established in the names of the J-1 visa holders and legal permanent residents. These companies purported to be engaged, for the most part, in the wholesale provision of DME to medical equipment providers and services related to the operation of medical clinics, including, but not limited to, office supplies, advertising, computer and billing-related services.  In truth and in fact, these companies engaged in little, if any, legitimate business and maintained few, if any assets.

II.   The Defendant and Relevant Entities

13.  The defendant ROBERT PETROSYANTS was an owner and manager of medical billing companies, including Right Choice

5

Consulting, Inc. and DJR Capital Group, Inc. (hereinafter collectively referred to as the "Petrosyants Billing Companies"). The Petrosyants Billing Companies filed New York State no-fault accident claims on behalf of medical clinics and DME providers. The checks received in payment of the claims were deposited into bank accounts in the name of the medical clinics and DME providers ("Provider Accounts"), which were controlled by ROBERT PETROSYANTS.

14. Zhan Petrosyants was the twin brother and co-conspirator of the defendant ROBERT PETROSYANTS. Zhan Petrosyants was a manager of the Petrosyants Billing Companies.

15. Belair Payroll, Inc. ("Belair"), was a check cashing business incorporated in the State of New York on or about August 12, 1997. Belair's principal place of business was located in Flushing, New York. Belair was a financial institution, as that term is defined in Title 31, United States Code, Section 5312(a)(2)(k), and accompanying regulations. As a result, Belair was subject to the CTR filing requirements of the BSA. The "Flushing Manager," an individual whose identity is known to the United States Attorney, was the manager of Belair's principal place of business.

16. Lasha Goletiani was a co-conspirator of the defendant ROBERT PETROSYANTS. Goletiani established check cashing accounts in the names of the Shell Companies. Goletiani, along with co-conspirator Zhan Petrosyants, received checks from the defendant

6

ROBERT PETROSYANTS, which were drawn from the Provider Accounts and made payable to the Shell Companies, and cashed those checks at Belair, receiving cash in amounts exceeding $10,000 in a single day. For a fee, Goletiani allowed individuals to write checks from corrupt medical clinics to the Shell Companies in order to disguise the origin and purpose of the funds.

III.    The False CTR Filing Scheme

17.    In or about and between May 2009 and June 2011, the defendant ROBERT PETROSYANTS provided co-conspirators Lasha Goletiani and Zhan Petrosyants with checks, which were drawn from the Provider Accounts and payable to the Shell Companies. Goletiani and Zhan Petrosyants, together with others, then cashed the checks at Belair, receiving cash that often exceeded, in the aggregate, $10,000 in a single day. Goletiani and Zhan Petrosyants, together with the defendant ROBERT PETROSYANTS, caused CTRs to be filed for the check cashing transactions that exceeded $10,000 in a single day, which falsely indicated that the transactions were conducted by the J-1 visa holders and legal permanent residents on behalf of the Shell Companies when, in truth and in fact, they were conducted by Goletiani and Zhan Petrosyants. For example:

a.    On or about August 26, 2009, Goletiani caused Belair to file a CTR falsely stating that checks provided by the defendant ROBERT PETROSYANTS to Goletiani were cashed at Belair in

7

excess of approximately $113,500.00 by the J-1 visa holders and/or legal permanent residents acting on behalf of their respective Shell Companies, when in truth and in fact, the transactions were conducted by Goletiani.

        b.   On or about January 19, 2010, Goletiani caused Belair to file a CTR falsely stating that checks provided by the defendant ROBERT PETROSYANTS to Goletiani were cashed at Belair in excess of approximately $107,150.00 by the J-1 visa holders and legal permanent residents acting on behalf of their respective Shell Companies, when in truth and in fact, the transactions were conducted by Goletiani.

        c.   On or about January 5, 2011, Goletiani caused Belair to file a CTR falsely stating that checks provided by the defendant ROBERT PETROSYANTS to Goletiani were cashed at Belair in excess of approximately $43,289.00 by the J-1 visa holders and/or legal permanent residents acting on behalf of their respective Shell Companies, when in truth and in fact, the transactions were conducted by Goletiani.

        d.   On or about January 11, 2011, Goletiani caused Belair to file a CTR falsely stating that checks provided by the defendant ROBERT PETROSYANTS to Goletiani were cashed at Belair in excess of approximately $22,135.00 by the J-1 visa holders and/or legal permanent residents acting on behalf of their respective Shell

8

Companies, when in truth and in fact, the transactions were conducted by Goletiani.

e. On or about May 9, 2011, Goletiani caused Belair to file CTRs falsely stating that checks provided by the defendant ROBERT PETROSYANTS to Goletiani were cashed at Belair in the amount of $77,799.00 by the J-1 visa holders and/or legal permanent residents acting on behalf of their respective Shell Companies, when in truth and in fact, the transactions were conducted by Goletiani.

18. When co-conspirators Lasha Goletiani and Zhan Petrosyants cashed the checks provided by the defendant ROBERT PETROSYANTS at Belair, the relevant J-1 visa holders, in many cases, were no longer present in the United States. In addition, the CTRs filed with respect to certain of the check-cashing transactions failed to indicate the full amount of cash provided to Goletiani and Zhan Petrosyants.

<u>CONSPIRACY TO FILE FALSE CTRS</u>

19. The allegations contained in paragraphs 1 through 18 are realleged and incorporated as if fully set forth in this paragraph.

20. In or about and between May 2009 and June 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ROBERT PETROSYANTS, together with others, did knowingly and intentionally conspire, for the

9

purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and the regulations promulgated thereunder, to cause and attempt to cause Belair Check Payroll Services, Inc. ("Belair"), a domestic financial institution, to file CTRs containing material omissions and misstatements of fact, contrary to Title 31, United States Code, Sections 5324(a)(2) and 5324(d)(2).

21.   In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant ROBERT PETROSYANTS and others committed and caused to be committed, among others, the following:

<u>OVERT ACTS</u>

a.   On or about August 26, 2009, co-conspirator Lasha Goletiani caused Belair to file a CTR stating that checks were cashed at Belair in excess of approximately $113,500.

b.   On or about January 19, 2010, co-conspirator Lasha Goletiani caused Belair to file a CTR stating that checks were cashed at Belair in excess of approximately $107,150.

c.   On or about January 5, 2011, co-conspirator Lasha Goletiani caused Belair to file a CTR stating that checks were cashed at Belair in excess of approximately $43,289.

d.   On or about January 11, 2011, co-conspirator Lasha Goletiani caused Belair to file a CTR stating that checks were

cashed at Belair in excess of approximately $22,135.

  e. On or about May 9, 2011, co-conspirator Lasha Goletiani met with the Flushing Manager at Belair and directed the Flushing Manager to continue to file CTRs without listing GOLETIANI's name on them and in the names of the Shell Companies and their nominee owners.

  f. On or about May 9, 2011, co-conspirator Lasha Goletiani caused Belair to file CTRs stating that checks were cashed at Belair in the amount of $77,799.

  (Title 18, United States Code, Sections 371 and 3551 <u>et</u> <u>seq</u>.)

<u>CRIMINAL FORFEITURE ALLEGATION</u>

  22. The government hereby gives notice to the defendant ROBERT PETROSYANTS that, upon his conviction of the above-charged offense, the government will seek forfeiture in accordance with Title 31, United States Code, Section 5317(c), of all property involved in each offense of conviction in violation of Title 31, United States Code, Sections 5324(a)(2) and 5324(d)(2). The property to be forfeited should include, but not be limited to a money judgment which represents the value of the forfeitable property described-above; and

  23. If the above-described forfeitable property, as a result of any act or omission of the defendant:

11

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with a third person;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 31, United States Code, Section 5317(c); Title 21, United States Code, Section 853(p))

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

JAIKUMAR RAMASWAMY, CHIEF
ASSET FORFEITURE AND
MONEY LAUNDERING SECTION
U.S. DEPARTMENT OF JUSTICE

12

**SIR:**

PLEASE TAKE NOTICE that the within will be presented for settlement and signature to the Clerk of the United States District Court in his office at the U.S. Courthouse, 271 Cadman Plaza East, Brooklyn, New York, 11201 on the _____ day of _____, 20_____, at 10:30 o'clock in the forenoon.

Brooklyn, New York

_____,20_____

United States Attorney,
Attorney for _____

To:

_____
_____
_____

Attorney for _____

**SIR:**

PLEASE TAKE NOTICE that the within is a true copy of duly entered herein on the _____ day of _____, in the office of the Clerk of the Eastern District of New York,

Dated: Brooklyn, New York

_____, 20_

United States Attorney,
Attorney for _____

To:

_____
_____
_____

Attorney for _____

Criminal_____ Action No.
2011R002302

## UNITED STATES DISTRICT COURT
### Eastern District of New York

UNITED STATES OF AMERICA

- against –

ROBERT PETROSYANT**S**

(T. 18, U.S.C., 371)

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
United States Courthouse
271 Cadman Plaza East
Brooklyn, New York 11201

Due Service of a copy of the within__
_____ is hereby admitted.
Dated: ____ , 20 _

_____

Attorney for _____

**Patricia E. Notopoulos
Assistant U.S. Attorney        (718)
254-6354**